# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| Alejandro Acevedo, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 06 C 3252 |
| -vs- ) | |
| ) | Senior U.S. District Judge |
| ) | GEORGE W. LINDBERG |
| Heinemann's Bakeries, Inc., et al., ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

This action was brought by plaintiffs, former full-time employees of defendant, Heinemann's Bakeries, Inc. ("Heinemann's"), and arose out of the closure of Heinemann's facility in Chicago, Illinois. In its current posture, the case involves those plaintiffs whose claims have not been either settled or dismissed. Plaintiffs' Fourth Amended Complaint includes five counts alleging violations of various statutes, including an alleged violation of the Worker Adjustment Retraining Notification Act ("WARN"), 29 U.S.C. §2101, *et seq.*, (Count I). Plaintiffs move for partial summary judgment as to liability and damages on Count I of the Fourth Amended Complaint. Defendant moves for summary judgment in its favor with respect to its liability under the WARN Act. For the reasons set forth more fully below, both motions for summary judgment are denied.

The following facts are not in dispute. See Fed. Rul.Civ.P. 56(c). Defendant was a premium commercial bakery in the Chicago area for decades. Plaintiffs were full-time employees of defendant and were members of the Bakery, Confectionary, Tobacco Workers and Grain Millers International Union, AFL-CIO, Local 1 ("Union"). Defendant and the Union were

parties to a valid collective bargaining agreement at the time of the plant closing. Defendant's products were sold to supermarket chains, warehouse clubs and supermarket distributors. Defendant's largest customer was the Dominick's supermarket chain in Chicago, which accounted for 80% or more of defendant's business. Defendant provided Dominick's with most of its bakery products and staffed Dominck's in-store bakeries. In October 1998, Dominick's was sold to Safeway Foods and as a result of the sale, Heinemann's shifted from operating in-store bakery operations at Dominick's and other grocery stores to a wholesale strategy of selling "thaw and sell" products nationwide. Between 2002 and 2003, defendant suffered financial losses. Although the losses decreased by 2004, defendant began investigating options for selling the business as a going concern.

From late 2004 through October 2005, numerous potential buyers were identified and defendant received letters of intent from three of them–Waveland Holdings, LLC ("Waveland"); Meriturn Partners, LLC ("Meriturn"); and S& J Food Management Corporation ("S & J Foods"), which provided a draft letter of intent. In March 2005, negotiations were started with both Waveland and Meriturn concerning the sale. On March 18, 2005, Meriturn provided Heinemann's with a letter of intent to purchase and on March 30, 2005, Heinemann's signed a "Term Sheet" with Waveland. Both prospective purchasers intended to purchase Heinemann's as a going concern. On July 19, 2005, Waveland's offer was presented to Heinemann's employees and their union and additional meetings were held sometime between July 18 and July 20 with employees. On or about July 26, 2005, Waveland withdrew its offer to purchase Heinemann's. On or about August 2, 2005, Meriturn withdrew its offer to purchase

Heinemann's. Between August 9 and 10, 2005, defendant and S & J Foods exchanged draft letters of intent. S& J Foods was experienced in the food industry, was well-funded and had studied defendant's operations extensively. On August 11, defendant learned that S & J Foods was meeting with customers and had planned to meet with the Union on August 12, 2005.

During this time, defendant's shareholders loaned the business funds to meet its payroll obligations and maintain operations. Additionally, in July 2005, defendant consulted with Development Specialists, Inc. ("DSI"), a management consulting firm that provides services on behalf of lending institutions, secured and unsecured creditors, shareholders, bondholders, and business owners. DSI and defendant entered into a Trust Agreement and Assignment for the Benefit of Creditors. The Agreement appointed DSI President and Chief Executive Officer, William Brandt ("Brandt"), as Trustee-Assignee of defendant's assets. Mr. Brandt was assisted by Steven Victor ("Victor"), a member of DSI's professional consulting staff. As a result, defendant's property and assets were transferred to Brandt who was to work with the goal of selling the business as a going concern. After the Assignment was executed, Heinemann's, its officers, its directors, and its supervisors continued to perform their normal daily responsibilities. Further, shareholders agreed that along with the Assignment for Benefit of Creditors there would be an assignee auction sale of the business as a going concern. The auction was advertised in the Chicago Tribune on July 31, 2005, and on August 7, 2005. The ad indicated that if the business was not auctioned off as a going concern, the defendant's assets would be auctioned off piecemeal. After initially scheduling the auction for August 11, 2005, the auction was rescheduled to August 16, 2005. During this period, defendant continued to negotiate with

potential customers and engaged in ongoing discussions with Waveland, Meriturn, and S & J Foods, all of whom continued to be interested in purchasing Heinemann's as a going concern.

On August 9, 2005, in response to rumors among the employees that the plant was going to close, Vincent Graham ("Graham"), an officer and director of Heinemann's, wrote a notice to employees which was posted at the plant. The notice alluded to rumors of the plant closing and stated that the Company did not intend to close the plant but to sell the Company to a buyer interested in continuing the business as a going concern.

On August 12, 2005, Greenfield Commercial Credit ("Greenfield"), defendant's primary lender, informed defendant that it was going to discontinue funding defendant's operations. Once Greenfield terminated funding, there were not funds available to pay employees or vendors and as a result, the decision was made to temporarily close the plant that same day. Since about August 2004, Greenfield had been providing funds to defendant and its loan was over-secured given that there were more than sufficient accounts receivable and inventory to cover the outstanding balance defendant owed to Greenfield. Additionally, the outstanding balance owed to Greenfield was substantially less than the maximum amount defendant could borrow. Further, Greenfield had been aware that DSI was attempting to sell Heinemann's as a going concern. In response to Greenfield's decision, DSI unsuccessfully attempted to obtain additional funding for Heinemann's from other lenders. On August 12, 2005, plant supervisor William Rimkus ("Rimkus") was provided with a notice to be posted by the plant security guard at the end of the work day informing employees that the plant was temporarily closing as of August 13, 2005. The posted notice instructed employees to call the Company on August 17, 2005, for possible

work schedules. Further, employees were informed that they would be paid for days worked up until August 13, 2005, and medical benefits would be paid through August 31, 2005. The notice concluded, "Regrettably, it was not possible to notify you of this at any time sooner." Defendant laid off most of its workers. Among those who remained employed at the plant was Rimkus.

On August 13, 2005, Graham met with the Union, the employee bargaining committee, and the employees to inform them that Heinemann's still had interested potential buyers. The attendees at this meeting were told that if the business was sold the plant could re-open in a few days, or soon after the scheduled August 16, 2005, auction. A public auction was held on August 16, 2005. Defendant and Victor were anticipating that one of the prospective buyers would bid on defendant's assets as a going concern. Unfortunately, none of those prospective buyers was present at the auction. Instead, Heinemann's was auctioned off piecemeal. Although the auction proceeded on a piecemeal basis, defendant refused to approve the piecemeal purchases. On August 18, 2005, Meriturn provided another letter of intent to purchase Heinemann's as a going concern. That sale was not consummated. Defendant's assets were eventually sold piecemeal in November 2005.

To succeed on a motion for summary judgment, the moving party must show based on the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(C); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In considering these cross-motions for summary judgment, the court must construe all facts in the light most favorable to the non-moving party and must make all reasonable inferences in that

party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254 (1986). A deposition or affidavit from a nonmoving party "can constitute affirmative evidence to defeat a summary judgment motion." *Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 843 (7th Cir. 1996).

Plaintiffs allege defendant is an "employer" within the meaning of the WARN Act; plaintiffs are "affected employees" who "suffered an employment loss;" and thus defendant was required to meet the notice requirements of the statute. 29 U.S.C. §§ 2101(a)(1), (a)(5)-(6); 2102(a). Plaintiffs argue that they suffered two employment losses giving rise to two WARN Act notice obligations: (1) on August 12, 2005, when the plant was temporarily closed; and (2) at the time of the permanent plant closing. Conversely, defendant argues it is entitled to summary judgment because it meets the unforeseen business circumstance exception to the WARN Act and thus was not only exempted from reducing the notice period from 60-days, but was entitled to complete elimination of notice to plaintiffs. 29 U.S.C. §§2102(b)(2)(A), (b)(3). Further, defendant argues that even if it violated the WARN Act, it made a good faith effort to comply with the requirements of the WARN Act and thus is eligible for a discretionary reduction of damages. 29 U.S.C. § 2104(a)(4).

Initially, the court addresses plaintiffs' argument that they suffered two employment losses giving rise to two WARN notice obligations. Although there may be circumstances under which an employee suffers more than one employment loss, this is not one of those circumstances. *Graphic Commun. Intl. Union v. Quebecor Printing,* 252 F.3d 296, 299 (4th Cir. 2001) (the statute contemplates that there may be multiple employment losses giving rise to multiple WARN notice obligations). Based upon the language of the statute and the rules of

06 C 3252

statutory construction, plaintiffs suffered only one employment loss, which occurred when the plant permanently closed. Although this issue is a matter of first impression in this Circuit, this court agrees with the Fourth Circuit which determined in a similar case that a temporary closing did not result in an employment loss. *Id.*

The WARN Act requires that employers provide 60-days notice of a plant closing or mass layoff to "affected employees." 29 U.S.C. §2102(a)(1). A "plant closing" is the "permanent or temporary shutdown of a single site of employment . . . if the shutdown results in an *employment loss* at the single site of employment." 29 U.S.C. §2101(a)(2) (emphasis added). A "mass layoff" means "a reduction in force which (A) is not the result of a plant closing; and (B) results in an *employment loss* at the single site of employment." 29 U.S.C. §2101(a)(3) (emphasis added). Thus, both a plant closing and a mass layoff require that the action result in an "employment loss." An "employment loss" is "(A) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (B) a layoff exceeding 6 months, or (C) a reduction in hours of work of more than 50 percent during each month of any 6-month period." 29 U.S.C. §2101(a)(6).

The temporary closing did not result in a "layoff exceeding 6 months" or a "reduction in hours of work of more than 50 percent during each month of any 6-month period." §§2101(a)(6)(B)-(C). Thus, the only portion of the "employment loss" definition potentially applicable to the August 12, 2005, closing is an "employment termination, other than a discharge for cause, voluntary departure, or retirement." §2101(a)(6)(A). When interpreting a statute a court is to "presume that [the] legislature says in a statute what it means and means in a statute

what it says there." *Connecticut Natl. Bank v. Germain,* 503 U.S. 249, 253-54 (1992). Thus, the inquiry begins with the text itself and will end there as well if the text is unambiguous. *Bedroc Ltd., LLC v. United States,* 541 U.S. 176, 183 (2004). The statute provides that WARN Act liability is imposed only where the employees suffer an employment loss as a result of either a plant closing or a mass layoff. Although the WARN Act itself does not define "employment termination," a Department of Labor regulation states it will interpret "employment termination" by its "common sense" meaning and thus, within the provision relating to employment loss, "employment termination" means the "permanent cessation of the employment relationship." 54 F.R. 16042, 16047 (Apr. 20, 1989). See *Perrin v. United States,* 444 U.S. 37, 42 (1979) ("a fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").

On August 12, 2005, defendant and its employees understood that the employer-employee relationship would continue. In the August 12, 2005, letter which was posted at the plant at the close of business that day, plaintiffs were told to contact defendant on August 17, 2005, for a "possible work schedule." Specifically, the notice stated: "You are asked to call the company on Wednesday 8/17/05, between the hours of 8 am and 4 pm for a possible work schedule." Further, in a meeting held with employees on August 13, defendant's officer Vincent Graham informed employees that potential buyers of defendant's business remained and that the business could re-open in a few days, if the business was sold as a going concern either at, or prior to, the August 16, 2005, auction. Both the content of the letter and the conversation with Graham indicated that the employment relationship was not terminated, and thus there was no

"employment loss" resulting from the temporary closing. See *Quebecor,* 252 F.3d at 300 (court held a temporary closing was not a "plant closing" or "mass layoff," because the terms require an "employment loss," and no "employment loss" occurred at the time of the temporary closing).

Defendant has argued that it was not required to provide notice to its employees or their representative prior to either closing because it met the requirements of the unforeseen business circumstances exception to the WARN Act. 29 U.S.C. §2102(b)(2)(A). In fact, defendant alleges that, beginning in February 2005, it was advised by its legal counsel on several occasions that it was not required to issue WARN Act notices because the company's situation was covered by the unforeseen business circumstances exception.

In accordance with the WARN Act, a "plant closing" cannot occur "until the end of a 60-day period after the employer serves written notice of such an order (1) to each representative of the affected employees as of the time of the notice, or if there is no such representative at that time, to each affected employee." 29 U.S.C. § 2102(a)(1). Where there is an employee representative, the "written notice is to be served upon the chief elected officer of the exclusive representative(s) or bargaining agent(s) of affected employees at the time of the notice." 20 C.F.R. §639.6(a). With respect to the content of proper notice, the regulations require that "All notice must be specific" then proceeds to provide information that must be included in the notice. 20 C.F.R. §639.7(a), (c). Generally, "the information provided in the notice shall be based on the best information available to the employer at the time notice is served." 20 C.F.R. §639.7(a)(4).

The WARN Act establishes exceptions to this 60-day notice requirement in three limited

06 C 3252

circumstances: (1) faltering business exception, (2) unforeseen business circumstances, and (3) natural disasters. 29 U.S.C. §§2102(b)(1); (b)(2)(A)-(B). An employer arguing the unforeseen business circumstances exception is asserting an affirmative defense to the statute's notice provisions and thus the employer bears the burden of proof that conditions for the exception have been met. *Loehrer v. McDonnell Douglas Corp.,* 98 F.3d 1056, 1060 (8th Cir. 1996); 20 C.F.R. §639.9. In determining whether the employer meets the requirements of the exception, the regulations encourage a "case-by-case" examination of the facts, establishing that a business circumstance is reasonably unforeseeable when caused by "some sudden, dramatic, and unexpected action or condition outside the employer's control." *Roquet v. Arthur Andersen LLP,* 398 F.3d 585, 588 (7th Cir. 2005); 20 C.F.R. §639.9(b)(1). Courts evaluate whether an event is unforeseeable based on the employer's business judgment. 20 C.F.R. §639.9(b)(2). Thus, the employer must "exercise such commercially reasonable business judgment as would a similarly situated employer" in the same market. 20 C.F.R. §639.9(b)(2).

At this point, genuine issues of material fact exist as to whether the unforeseen business circumstances exception applies with respect to the permanent plant closing. Although defendant alleges that Greenfield's decision to discontinue providing defendant a revolving line of credit used to pay its operating costs caused the plant to close, it is unclear whether this decision caused both the temporary and permanent plant closing. Prior to the August 12, 2005, temporary closing dates, defendant alleges that it intended to sell the business as a going concern and presented admissible evidence supporting that intent. Defendant engaged in ongoing negotiations with potential buyers not only in the months leading up to August 12, 2005, but

-10-

within days of that date it continued entertaining potential offers from buyers interested in purchasing the business as a going concern. However, on July 31, 2005, defendant posted an advertisement in the Chicago Tribune which informed the public of an auction to potentially sell the business on a piecemeal basis. Additionally, plaintiffs allege that when Union president Jethro Head ("Head") and plant supervisor Rimkus were informed of the temporary plant closing, they were told it was the result of ongoing financial difficulties defendant had been experiencing. In his affidavit, Rimkus stated that he was told the temporary closing resulted from defendant's failure to secure an outside buyer for Heinemann's. Neither Head nor Rimkus were told the closing was caused by Greenfield's sudden decision to revoke the loan.

Further, plaintiffs allege that even after Greenfield decided to revoke funding, defendant had the ability to continue the operations of the plant for 60-days prior to the closing. Plaintiffs argue that the alleged revocation of the funding by Greenfield is based on conclusory statements and unsupported allegations made by defendant's officers and not on admissible evidence. However, a deposition from a nonmoving party can constitute affirmative evidence to defeat a summary judgment motion. *Mills v. First Fed. Sav. & Loan Assn.,* 83 F.3d 833, 843 (7th Cir. 1996). The statements were made by three individuals who had personal knowledge and plaintiffs have pointed to no evidence indicating that the statements are false. Additionally, this court does not need to evaluate defendant's financial statements to determine whether it could have remained open for 60-days. See *Jurcev v. Central Community Hosp.,* 7 F.3d 618, 625 (7th Cir. 1993).

Moreover, this court is unable to determine the permanent closing date of the plant.

Defendant attempts to establish that the permanent closing took place on August 16, 2005, and alleges that Rimkus posted a notice at the plant on that date informing the employees of the permanent closing. Specifically, defendant alleges the August 16, 2005, notice stated in part: "It is with deep regret that we announce the closing of Heinemann's Bakeries, Inc., as of August 16, 2005. After seventy years of providing quality baked goods to our loyal customers, it was decided to cease operations due to several economic considerations." Conversely, plaintiffs have submitted an affidavit from Rimkus stating that he had never seen defendant's closing notice and that he had never seen that notice posted on the plant's premises. Additionally, the evidence establishes that on August 18, 2005, Meriturn provided a renewed letter of intent to purchase Heinemann's as a going concern and defendant's assets were not sold piecemeal until sometime in November 2005. Given this conflicting evidence, the court is unable to ascertain the date upon which the plant permanently closed.

Although there remains a genuine issue of material fact with respect to the permanent closing and the alleged notice posted at the plant on August 16, 2005, it appears that even if posted the notice may well fail to meet the WARN Act's notice requirements. 29 U.S.C. §2102(a), (b)(3); 20 C.F.R. §639.7. In addition to the notice not being provided to the appropriate "representative" or "affected employees," it did not meet the requirements of 20 C.F.R. §639.7. 29 U.S.C. §2102(a)(1); 20 C.F.R. §639.9. Moreover, it is questionable whether the notice, posted in an empty plant, was designed to notify the affected employees who had been laid off starting August 13, 2005, and thus were not present on the premises after the notice was purportedly posted. Additionally, the notice fails to provide a "brief statement of the basis for

reducing the notification period" which "provide[s] employees with information that would assist them in determining whether the notice period was properly shortened." 29 U.S.C. §2102(b)(3); *Alarcon v. Keller Industries, Inc.,* 27 F.3d 386, 389 (9th Cir. 1994). The notice simply stated that the plant closed "due to several economic considerations."

Finally, defendant argues that it made a good faith effort to comply with the WARN Act. Although a determination of good faith may be made on summary judgment, such determination is not appropriate here, where defendant has failed to meet its burden of establishing its own good faith. *Childress v. Darby Lumber, Inc.,* 357 F.3d 1000, 1007 (9th Cir. 2004). Defendant alleges that it had discussed its obligations under the WARN Act with its counsel as early as February 2005, and was advised that it did not have any WARN Act obligations because it was covered by the unforeseen business circumstances exception. However, there is no evidence of these conversations or counsel's research into WARN Act compliance. Further, it seems unlikely that as early as February 2005, counsel would have been able to inform defendant that it would ultimately have no obligations under the WARN Act due to unforeseen business circumstances when Greenfield's decision to discontinue funding defendant's operations did not occur until August 12, 2005. Rather than make the determination of defendant's bad faith on summary judgment, the court will leave this determination up to the trier of fact, which will be able to consider the credibility of the witnesses testifying on this issue.

The court concludes that plaintiffs suffered an employment loss at the time of the permanent closing which occurred sometime between August 12, 2005, and November 2005. Genuine issues of material fact exist with respect to whether defendant met its burden of

06 C 3252

demonstrating that the unforeseen business circumstances exception of the WARN Act applies, and thus was permitted to reduce the WARN Act notification period to less than 60-days or eliminate it entirely. Finally, genuine issues of material fact exist with respect to whether defendant made a good faith effort to comply with the WARN Act.

**ORDERED:** Plaintiffs' motion for partial summary judgment [212] is denied. Defendant's motion for partial summary judgment [222] is denied.

ENTER:

_____
GEORGE W. LINDBERG
Senior U.S. District Judge

DATED: April 9, 2008